willingness to accept the appointment? Of course, Your Honor. Thank you. My privilege. My name is John Williams. I'm here on behalf of Carl Roberts this morning. Mr. Roberts has had severe mental impairments since he was 12 years old, when a dump truck accident destroyed 15 percent of his brain. Today, I would like to focus on how two of Mr. Roberts' specific mental impairments factor into his conviction and death sentence. First, the Eighth Amendment forbids Mr. Roberts' execution under the Supreme Court's 2002 decision in Atkins v. Virginia. And second, Roberts was incompetent to be tried because his schizophrenia rendered him unable to rationally assist his counsel. The district court committed error by mechanically applying AEDPA deference to these two claims without any analysis of whether AEDPA applies or without whether Roberts satisfied its standard of review. As to the Atkins claim, Roberts has been diagnosed as intellectually disabled. Reviewing this claim de novo, the court should either grant relief on the Atkins claim or remand for additional findings. And additionally, the court should vacate the conviction based on the substantial state post-conviction record showing that Roberts was incompetent, including clear errors in pretrial testing and a strong record that Roberts was suffering from psychosis at trial. Now, I'd like to begin with the intellectual disability claim and specifically the standard of review. 2254D does not apply to this claim because the claim was never adjudicated on the merits in state court proceedings. Well, wasn't it, in fact, adjudicated on the merits in state court proceedings in the pretrial proceeding? What was adjudicated on the merits in the pretrial proceeding was a state statutory claim. State trial counsel brought a motion under the Arkansas state statute which allowed someone to allege that they were, as it was termed at that time, mentally disabled. Doesn't the Supreme Court allow the states to use their own laws to satisfy the requirements of Atkins? And here, I think the Arkansas Supreme Court's found that the particular statute in question that Judge Grunder referred to satisfies Atkins. Or is there a method of satisfying Atkins? That's true, and that's what this court has acknowledged in Jackson as well. But the key precedent from this court that establishes that this is not adjudicated on the merits is Simpson v. Norris. And in that case, the court held that a state statutory claim that someone is mentally retarded is separate and distinct from a Atkins claim, an Eighth Amendment claim that was established in 2002. Counsel, is it separate and distinct for all purposes or just for procedural default? I think it is separate and distinct for all purposes. It is hard to escape the logic that they are separate and distinct for both purposes. So for procedural default, because someone did not bring a state statutory claim, they are still allowed to bring that claim in the federal court under the Eighth Amendment. The same logic applies here. If the claim did not exist in 1999-2000 when the trial court addressed it, there is no way that the state court could have adjudicated that claim on the merits. Let's look a little deeper into that question. Obviously, it's a key question here. In what ways are they separate and distinct for purposes of this case? Because even under Atkins, doesn't the court apply the state law as long as it's consistent with the Atkins requirements? Well, I think they are separate and distinct legally, and I think Simpson establishes that. Regardless of whether the panel agrees with the reasoning of Simpson, that is the law. So they are legally distinct. I think they are factually distinct as well, because the constitutional requirement for intellectual disability is that the court follow clinical standards for determining intellectual disability. And this goes to the E1 question as well. The trial court did not follow any sort of clinical standards whatsoever in determining intellectual disability. To do that, the court would have to do a more holistic assessment of the person's intellectual functioning and not rely simply on an IQ score, which is what happened in the trial court. The court would have to look... Is that fair to say that it relied only on an IQ score? I mean, was it Dr. Mallory had a fairly lengthy examination of your client, four days as I remember, and wasn't all that evidence in front of the court at that point? It is true that Dr. Mallory had a lengthy examination that went more toward the competency question. What he did is he gave him a WACE, which is an intellectual disability test for intellectual functioning. And he received a 76 on that test, and he testified that there was a 76, and that is what the trial court relied on. There was no further analysis of whether he had adaptive deficits. There was no further analysis of whether there was other things in his intellectual functioning that would show that he had significantly sub-average intellectual functioning, which is how the courts are required to assess that question under the Eighth Amendment. And I think Jackson and Sasser II from 2013 are quite clear on that. So the determination in the state court was really based only on that IQ score, and that is not a constitutional intellectual disability analysis under Atkins. So on the D question, the Simpson controls here. Again, a claim that did not exist in 1999 could not have been adjudicated on the merits. The first opportunity for adjudicating that claim on the merits was when Roberts presented it in his state post-conviction petition. But the state courts did not adjudicate that claim. Rather, they simply referred back to the trial court determination, which again was not an adjudication on the merits. So review under D should be de novo. Then I think we get to E1, and for the reasons that I've stated, those claims are factually distinct as well, and no E1 deference is due to an intellectual disability determination. There are facts in the record that would have received that deference, such as that he had a 76 IQ. No one's contesting that IQ score. And I know that the state has pointed to issues regarding his adaptive functioning and stray comments that Dr. Mallory made and that the state trial court made about him being able to hold a job and things of that nature. But again, that is not a satisfactory intellectual disability determination under the Constitution because the determination requires the court to look at deficits as well as strengths. There was no analysis. I mean, Dr. Mallory admitted in the trial court, going back to his evaluation, that he could not do a DSM analysis of intellectual disability. The record shows that he did not do an adaptive functioning assessment. So this was not a constitutionally adequate intellectual disability determination for the purposes of Atkins. Is this case distinguishable from the Fourth Circuit's decision in Conaway v. Polk, and if so, how? It is. Conaway, and again, what makes the difference here is the Simpson precedent. If the court were determining this in the first instance without Simpson, there might be a reason for them to determine the case, for you to determine the case as the court did in Conaway. But the Simpson precedent, again, establishes that the claims are separate and distinct and should be adjudicated differently, not as one claim, which is what the Fourth Circuit did in Conaway. You rely heavily on Simpson, though. Isn't Simpson a different case in the sense that in Simpson he wasn't even able to present his intellectual disability defense? That is true. I think that goes to the question of the hearing. But it's also true of Roberts because, well, let me start at the trial level. He could have presented a statutory claim. The statute existed at the time of Simpson's trial. And the difference between Simpson and Roberts is that Roberts made at least an initial effort to present that statutory claim. I don't think Roberts should be penalized because he made that initial assessment, whereas Simpson did not. But then when it comes to the question of Rule 37, the court went on to determine that Simpson did not have an avenue to raise that claim in state post-conviction in Rule 37. That is, although Roberts attempted to present that claim in Rule 37, the state court did not adjudicate the claim. It didn't give a ruling on the claim. And I think that puts, for the purposes of a potential hearing on remand, that puts Mr. Roberts in the same position as Simpson. There was no full and fair hearing because there was no engagement with the intellectual disability evidence. There was simply reference back to the trial court's pre-Atkins decision. What substantive difference do you see between the statutory requirements that were adjudicated and the constitutional requirement that you want us to use now? Well, I think the passage of time in the decision of Moore and Hall makes all the difference here. The substantive difference between what happened in 1999 and what should happen now is that the court should look more holistically at his intellectual functioning. It shouldn't rely on simply a 76 IQ. It should look at his adaptive deficits and look at how they interact with his intellectual functioning. And it should assess his intellectual disability in the manner that the court said it should be assessed in both Sasser and Jackson. Did the trial court really just rely on a 76 IQ? Didn't it also look at the facts and circumstances of the crime itself and his behavior after the crime, that kind of thing? I read the trial court's decision, which is five sentences in a verbal order and two sentences in a written order, as really relying on the 76 IQ. The verbal order was based primarily on competency. He said, based on the testimony of Dr. Mallory, I think the defendant is competent and capable of standing trial and to be subject to the death penalty. Subject to the death penalty is him adjudicating the mental retardation motion, I think. I think he can assist his attorneys in his defense, and the doctor's testimony states his evaluation is sufficient to meet the requirements of the law. And then he continues to talk more about competency. And in the written motion, he says, following a hearing regarding the defendant's competency and after hearing testimony from Dr. Mallory of the Arkansas State Hospital regarding the defendant's IQ, the court hereby finds that the state may seek the death penalty at the trial of the matter. So the written order really relies on, I mean, the verbal order does not really say much about IQ. The written order really relies on that 76 IQ. There were some stray remarks about his functioning, but in terms of the offense and everything like that, I think Moore is clear and Jackson is clear that the court can't simply rely on the facts of the offense to determine that he had no adaptive deficits. So the proper resolution, and again, I want to highlight what we did show in state post-conviction, which the state courts did not adjudicate. Dr. Garrett Andrews' opinion, he took a holistic assessment of intellectual functioning. He didn't look simply at the IQ, but he looked at his neuropsychological testing and the severe impairments that he showed in that neuropsychological testing. He looked back at his adaptive functioning, looked back at his school records, looked back at statements from his family, found that he had limitations and needed supports in terms of his practical domain, his ability to go about the activities of daily living, his conceptual domain, academics and that sort of thing, and found that he was intellectually disabled. So that, although we think that conclusion is sufficient for relief, we also think that it is certainly enough to go back for a hearing if the court has any questions about his intellectual disability under Simpson and Sasser. I'd like to move briefly to the competency issue, unless there are more questions on intellectual disability in Atkins. So on competency, epideverance does apply to this claim. We don't dispute that. But the district court erred by rubber stamping the state court's opinion. This is a rare case where the petitioner can show an unreasonable determination of facts based upon the state court record. When faced with unrebutted evidence on his competency, the state court simply referred back to the pretrial competency decision, didn't engage the new evidence, and that was unreasonable. And when we actually look at the facts, I think there's a clear record that he was incompetent to be tried. And there are five things I would like to highlight very briefly to establish that. First, his schizophrenia. There is overwhelming evidence that he was schizophrenic, that he is schizophrenic. No one debates that. I think the dispute has been the timing of his schizophrenia. So when was the diagnosis made? So he was first diagnosed in 2011 by Dr. Fuji.  And that carried out, the hearing, there was a hearing. So that was 12 years after the trial. That was 12 years after the trial. And there is robust evidence from both Dr. Peacock and Dr. Fuji that schizophrenia is not a condition that simply develops late in life. He had schizophrenia when he was in his teens and at the time of this offense. That is just the way that the diagnosis works. But he was evaluated by several doctors, none of which reached that conclusion, right? That's true, and there were some reasons for that. One, Dr. Malley threw out his test, which had the psychosis scales, for bad reasons, and Dr. Fuji talked about that in the hearing. And Dr. Weatherby, who was the trial, the state, excuse me, the Roberts expert at trial, found that he, that schizophrenia suggested, she saw that he had psychotic symptoms. She didn't get all the way to the diagnosis, primarily for reasons we state in our intellectual disability, or excuse me, our ineffective assistance of counsel claim, which is that she wasn't given sufficient information. But he is schizophrenic, and that condition is of long standing. There is evidence about how those psychoses worked. Before the trial, his seeing people, his auditory hallucinations, his outbursts, these are all symptoms of his mental conditions. So I think the question is not so much whether he was schizophrenic at trial, but the question is whether that schizophrenia was affecting his ability to assist his counsel. And there is ample evidence in the record that he was psychotic at trial. And I think the primary evidence is this hearing before the trial about someone recording him in his cell. I know this was sort of taken at face value in the trial court record that someone might have been recording him in his cell, but this is clearly an instance of him having auditory hallucinations. And the trial court found, of course, no one is recording him in his cell. No one is sending him messages in his cell. But he was hearing things in his cell, and that was sussed out at a hearing two weeks before trial. You also have his trial counsel basically telling us at the Rule 37 hearing that there was no way for us to really get anything out of him. He wasn't cooperating with us. And that goes directly to the assistance prong of competency. And I think particularly important is the misscoring of the competency instruments. Dr. Fuji talked about this at the Rule 37 hearing. Both the Georgia competency test, which Dr. Mallory administered, and the test that Dr. Weatherby administered, going to your question, were misscored. In fact, Dr. Weatherby's test showed that he should not have passed her competency instrument. So that is based upon contemporaneous records and Dr. Fuji's expert opinion. After looking at all those records, Dr. Fuji opined that he was incompetent to be tried, and no one at the Rule 37 hearing rebutted that. I've ended my rebuttal time. I can take further questions if there are, or I can come back in at the end. Very well. Good morning, Mr. Lubke. Good morning, Your Honor. Thank you. May I proceed? Please. May it please the Court, on May 15, 1999, Carl Roberts drove his 12-year-old niece, Andy Brewer, out into the woods of Polk County, Arkansas, and raped and murdered her. For these acts, he was convicted of capital murder and sentenced to death. Since the time of the murder, for 24 years now, twice as many years as Andy had on this earth, attorneys acting on behalf of Roberts have continually litigated issues related to his intellectual abilities and competence. Mr. Williams was talking about two of those issues today, and those issues were decided by the state court. Accordingly, this court should affirm the district court's decision to apply the deferential standards of the Anti-Terrorism and Effective Death Penalty Act, AEDPA, and affirm the denial of habeas relief. I'll start with the intellectual disability. The district court denied that, applying both deference under 2254D and the presumption of correctness under 2254E1. Either one of those statutes is sufficient to defeat Carl Roberts' claim here, but he applied both of them, and I think they were both correctly applied. I'll start with E1. E1 gives a presumption of correctness to any factual findings that must be overcome by clear and convincing evidence. As some of the judges know. Let's maybe deal with the preliminary question that was discussed quite a bit in the other argument, is whether there was an adjudication. I think Mr. Williams argues that there was an adjudication of a state statute versus what should be considered an adjudication would have to be a constitutional standard. What's your response to that? There was an adjudication of the state statute, which the Arkansas Supreme Court has said, and this court has said, is the same as the Eighth Amendment claim. In 1999, he raised that state statutory claim. The elements of that claim, I think it's important to look at that, are that he has to prove sub-average intellectual functioning, deficits in adaptive behavior, and that there was an onset prior to the age of 18. The same elements that there would be in an Atkins claim. When the hearing was had on that claim, Roberts' counsel announced that he was going to rely on the testimony of Dr. Mallory for that claim, and Dr. Mallory specifically spoke to intellectual functioning and whether or not Roberts had any adaptive behaviors. That claim was fully adjudicated, and then it was reviewed through the mandatory review. We know that for a fact because the Arkansas Supreme Court said as much in 2020, and its later Rule 37 opinion had said we did adjudicate that claim, and the adjudication of that claim is the same as an adjudication of the Atkins, as the Fourth Circuit found in the Conway v. Polk case. I think counsel maintains that there was no testimony from anyone competent to make the adaptive deficit analysis. What's your response to that? I think that is a misstatement of the record. I don't think that's a fair reading of Dr. Mallory's testimony. I want to highlight specifically Dr. Mallory testified, and this is at page 667 of the trial court record, or it's in the appendix at E73. To get any kind of mental diagnosis, you have to have a major impairment of some life activity, and I could not determine that, meaning I couldn't find that. If you have low IQs plus a major impairment, then you could call it mental retardation, or as we would call it today, intellectual disability. A couple pages later, he says the intellectual handicap, he's referring to his low IQ score, did not prevent any major life activity. He then goes on to talk about Roberts holding down a job for six years, a semi-skilled job as a concrete finisher. He talks about Roberts being married, having children, Roberts scoring high on a reading test. Those go to the practical, the social, and the academic domain. He's looking at those areas of the DSM and saying, I interviewed Roberts, and he went further, he interviewed the family members. His report says, you'll see that, that he interviewed the family members, and he simply didn't find any evidence of any adaptive deficits. That's what his testimony is. When the trial court says, I'm relying on that testimony, and I find that he is not ineligible for the death penalty, that he is eligible for the death penalty, that is a finding under those statutory factors. That's accepting Dr. Mallory's testimony as to those factors, and that's an adjudication of an Atkins claim, of an intellectual disability claim. That's where you get a factual finding from the trial court that's entitled to a presumption of correctness under E-1, and then when that's later affirmed by the Arkansas Supreme Court on its mandatory review, as it told us that it did in 2020, that's where you get an adjudication that can be given deference under D-2. Counsel, Mr. Williams, talked a lot about Simpson and Sasser, and they talk about these claims being separate and distinct, and Your Honor asked a question about isn't that really in the context of procedural default, and I believe that's the correct way to view it. While the state doesn't believe that Simpson and Sasser were correctly decided, it is very clear that they're not dispositive in this case. They do not control. The idea being that you cannot divorce Simpson from the context that it was heard in, procedural default. Simpson did not raise the statutory claim that was available to him, but Atkins hadn't been decided. And so the court said, you know, in fairness, because you were not aware that by not raising that statutory claim, you were giving up a later Eighth Amendment claim, then you haven't procedurally defaulted that claim. While procedural default and adjudication are similar concepts, they're not two sides of a coin. They're not mirror images of each other. If you fully litigate a state claim that subsumes the federal standard, there's case law that says that. If you fully litigate a state claim where all of the factors are the same, say Johnson v. Williams from the United States Supreme Court, if the state law claim subsumes the federal standard, then the federal claim may be regarded as adjudicated on merits. The whole point of AEDPA is that if you got your chance to litigate your claim once, you don't get a chance to do it again. We just review whether or not it was appropriately litigated and correctly litigated. And he can't overcome the 2254D or 2254E1 bars here. To say that he, that these, to apply Simpson and say that they're separate and distinct, even though they, we later say in Sasser that they're the exact same claims. You litigate the statute, you're litigating the Atkins claim. And Atkins itself cites the Arkansas statute as part of the growing trend towards allowing the recognition of this Eighth Amendment right and then leads it up to the states. And the state says our statute is how we apply Atkins. And no federal court has ever said that that's incorrect. It would be giving Roberts a windfall, a second chance that AEDPA just simply does not allow. Roberts writes in his own brief when talking about AEDPA that a state court decision is only unreasonable if the courts presumptively correct factual findings do not find support in the record, any support at all. Here we have not only the testimony of Dr. Mallory. Roberts' own expert at trial, Dr. Weatherby, said, looked at that and found that he was not intellectually disabled either. She found him to be borderline. And her dispute with Dr. Mallory's testimony, and this is in her, I would point the court to her testimony in the record. She said that her dispute with him is that he didn't give a borderline intellectual functioning diagnosis because there was no need for deficits to find a borderline intellectual finding. And that's in Appendix G341. And so both of these experts considered whether there were any deficits. Both of them had interviewed Roberts and his family members and found that there weren't any deficits. So the claim was adjudicated by the Arkansas Supreme Court. So you can apply 2254D. And at that point under Columby-Penhulster, the only opinions you're looking at are Weatherby and Mallory. And neither one of them finds that he's intellectually disabled. And based on those opinions, Roberts' counsel made a point to ask the jury to find that he was borderline intellectual functioning in mitigation. And that's something that they did find. And so we have a full adjudication under federal standards of whether or not he was intellectually disabled, and this court should defer to that. But regardless of whether the court wants to apply 2254D, I would pull back. I think it's very clear that 2254E1 applies because the state court, and this court has said that E1 applies to trial court findings as well as appellate court findings. I think the district court talked about some language in the appellate court opinion, and that's fine that they could rely on that as well. But I think it's really clear that the trial court, when it made its ruling, I rely on Dr. Mallory and I find he can be, he is eligible for the death penalty, made a finding that he's not intellectually disabled. And Roberts would have to rebut that by clearing convincing evidence. And all we really have is a battle of the experts. His expert and the other experts who found him to not be intellectually disabled. I think if you go through the records, there are four psychologists or neuropsychologists who opine on whether or not Roberts is intellectually disabled. Dr. Mallory, Weatherby, Dr. Peacock, who reviewed, like Dr. Mallory was a courts expert, who reviewed him at the Rule 37, did a little actual testing and found he wasn't intellectually disabled. And then Dr. Andrews. Three of those four experts talked to Roberts. Two of them talked to Roberts' family member. The only ones that didn't and simply reviewed records is Dr. Garrett Andrews. And so I would say one of these things is not like the others. And you have three experts. He's not presenting clear and convicting evidence to rebut that state court finding. But regardless of that, if you found under 2254D, you don't even consider Garrett Andrews' testimony. I would turn briefly to competence to stand trial. Once again, this was an issue that was decided, fully litigated and decided in Arkansas State Court. And the district court correctly applied deference under 2254D and 2254E1. Roberts admits in his brief on page 62 that the Arkansas Supreme Court articulated the correct legal standards. And so it goes down to whether or not this is, in light of the facts, a correct adjudication by the Arkansas Supreme Court's latest adjudication, the Rule 37 opinion in 2020. And I think, again- Was proper consideration given to the fact that he was apparently imagining things at the time of trial about people recording him? The Arkansas Supreme Court, when it released its latest decision, said it looked at the later testimony from the Rule 37 and the earlier testimony and said that it found that the earlier testimony stood and he was competent to stand trial. I think Mr. Williams would want the court to write more, but the United States Supreme Court has said repeatedly that it does not set opinion writing standards for state courts. State courts can discuss claims as little or as much as they want to. The fact is that they mentioned the evidence and then decided the claim. That's sufficient here for the deference. What about the testimony of the four lawyers at trial? Did any of the reviewing courts address that? And I think the Supreme Court has said, you know, we take particular interest in what counsel says about their interactions with the defendant. Here, I think there's some record that indicates they had a hard time communicating with him. I don't remember. I don't think the district court addressed that. I don't think the Arkansas Supreme Court addressed that. I don't know that they specifically addressed that. I mean, they do a holistic review of the record in all death and light cases, and they review all the evidence, and they said they found that there wasn't any clear error. That testimony was before them, so they clearly considered it. I would also point out there's a difference between being able and being willing to assist counsel. And Dr. Weatherby, who found him capable of assisting counsel and competent, noted that she found him competent, and she interviewed him and took evidence as to his discussion of voices and delusions. So he was assisting in his defense, and certainly in talking to Dr. Weatherby and talking to Dr. Mallory. It was the defense that sent him down there to the state hospital to be evaluated by a courts expert, by Dr. Mallory, and he cooperated with that. And I would point out that Your Honor mentioned a little bit ago this hearing where he was hearing voices. I think it's speculative to say that that's evidence of the psychosis. I think if you read the testimony of that hearing, he's in a jail cell that's across the hall from a radio room. He's hearing it through a wall. He never says that he hears his voice or his name. Whether or not those are people actually talking or psychosis, I think it would be pure speculation. I think that's Dr. Fuji back-projecting. But the other reason I want to highlight that incident is they take issue with whether or not he was able to assist his counsel. The one thing that hearing demonstrates clearly to this court, and this court can have no doubts about after that, is he was assisting in his own defense. He had a concern about something that happened in jail, and he brought it to his lawyers, and they litigated it before the court. That's evidence that he can assist in his own defense. That's what we want a trial court, that's what we want a defendant to do, to be able to bring up issues to his counsel and have them presented to the court. That's what competence is. And that's what he did. And then finally, Mr. Williams was talking a little bit about the misscored tests. One thing he did, he was a little, he didn't bring out, is that Dr. Fuji in his testimony didn't actually say, he never says that even under my view of the Georgia competency test, Roberts fails. In fact, at one point in his testimony, and this is at the appendix at S-416, he noted that under his scoring, according to the criteria, his rescoring, a person would be fit. So even he believed that he passed the Georgia competency test. He talks about questions that he would have scored differently, talks about some questions that are blank, but he never says that Roberts didn't pass the Georgia court competency test. And I think the other reason that the Arkansas Supreme Court was correct to look at the earlier experts who found him to be competent, as opposed to Dr. Fuji, is because the question is, what if any psychosis did he have at that time and was it affecting him at that time? They're the only experts that interviewed him at that time. Dr. Fuji interviews him 11 years later, well, 12 years after the crime, 11 years after the trial, which took place in the year 2000, and then he looks at certain anecdotes and back projects. But the other two experts sat with Roberts for multiple hours. The state hospital reviewed him, had him under observation for multiple days, and they found that he was competent. And so to, you know, again, I would say Roberts put this in his own brief. A state court decision is based on a reasonable termination of the facts only if the court's presumptively correct factual findings do not support, do not find support in the record. Here there is support for the court's finding that he's competent to stand trial. And so under AEDPA, this court has to defer to that and should affirm that's what the district court did. I have a couple minutes remaining unless the court has any other questions. Mr. Lucchi, I do have one. Yes, Your Honor. And this was confusing to me, so maybe you can clear it up. My understanding is the Arkansas Supreme Court subsequently determined that he was not competent to waive his post-conviction proceedings. Yes, that's correct. And was there a finding with respect to his competency to waive direct appeal? Yes, that happened in the very first, in the direct review opinion. There is a discussion of his competency to waive, and they talk about how the court considered it. Those two things happened at the same time, right? Waiving of his post-conviction and waiving of his direct appeal. No, they did not. At the time when he waived his direct appeal, and waiver in a sense that he was still given a direct review and the court reviewed all objections to see if any were prejudicial to him, so whether or not there really was a waiver is kind of disputed there. I see. What you're saying is he got review anyway. He got review anyway. I see. But in answer to your original question, Your Honor, and I apologize for getting off the point, while they do talk about Rule 37 and habeas at the time that he makes his waiver right after trial, that is not the waiver that the Arkansas Supreme Court later says is not, that he wasn't competent to give. After direct review happens, he comes back and has a hearing without a lawyer multiple years after, and kind of what the Arkansas Supreme Court says in its first opinion on that is, it's been a long time. You need to review his competence again. And then they go back, and that's where Dr. Peacock and Dr. Fuji come in and review his competence again, and the trial court found he was competent to waive, but the court reversed, and that's where they said he wasn't competent to waive. So the original one was just as to the direct appeal, even though they discussed the other. It's the later one that they had concerns with years later after he'd spent years. I'm out of time. I would ask the court to affirm the district court's denial of habeas relief. Thank you. Very well. Thank you. Mr. Williams, rebuttal. Thank you. I would return briefly to the Simpson issue. Simpson and Roberts are in, although factually different positions, the exact same position as a matter of substance. Mr. Loebke says that it would give Roberts a windfall to be able to have de novo review on this. Well, I'm not sure how well she'd characterize what Simpson got when he could have brought his state statutory claim, and then he was able to go and then litigate his federal constitutional claim. So I think Roberts is entitled to the same sort of relief. The court could not have adjudicated on the merits a separate and distinct constitutional claim that did not exist in 1999. And that also answers Mr. Loebke's point about Johnson v. Williams. You know, I understand that aspect of habeas law, that often a state adjudication is meant to subsume a federal adjudication, but that assumes that the federal right exists at the time of the state adjudication. Again, Simpson answers this question. There could be no adjudication of a federal constitutional claim in 1999 that didn't exist. On the factual issue, E-1. Again, I think D-1 is straightforward under Simpson. D does not apply. E-1 may be a little bit more difficult, and I think we're talking a lot about what the court did and didn't do at the trial era. I do want to point out that at the same part of the record that Mr. Loebke cited on the decision about mental retardation in 1999, Dr. Mallory said, I can't do it as a DSM system. That's what he said, and I read that as him saying that he cannot assess for adaptive deficits. When Dr. Andrews looked at that, he didn't see that as an assessment of adaptive deficits. Our position is the only assessment of adaptive deficits is in the state post-conviction record. E-1 is also a rebuttable presumption. It's a presumption that we can rebut. We assert that we have rebutted that presumption in the state post-conviction, but a hearing is also available in federal court to rebut that presumption. At the very least, we think Mr. Roberts is entitled to further proceedings in a hearing on that. The state has not argued at any point that we are not entitled to a hearing. E-2 does not forbid that hearing because Mr. Roberts was diligent in state post-conviction at presenting his state court record. And I think, again, the Simpson and Sasser logic suggests that the hearing should occur if there are any questions about intellectual disability because there was no full and fair hearing in the state post-conviction proceeding when Mr. Roberts was first able to present his federal constitutional claim. One point of rebuttal on the competency issue. What Dr. Fuji did say about the Georgia competency test and the record is perhaps not as clear as it was on Dr. Weatherby's test where Dr. Fuji said he scored below the competency threshold on that test. But what Dr. Fuji did say is that competency is an issue you cannot just rely on a test to determine. And I think the trial court did put a large amount of weight on that Georgia competency test in its citation of Dr. Mallory's testimony. Dr. Fuji looked more holistically at his competency. When he saw the errors in the Georgia competency test as well as the fuller record of his psychoses, he determined that he was incompetent to be tried. And that was not rebutted in the Rule 37 record. So if there are no further questions, my time has expired. Very well. Thank you. Thank you. I'd like to thank both counsel for your appearance and argument. It was a very good argument and I think it will be helpful to us. You may be excused. Ms. Rudolph, would you announce our second?